IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ITEASHA R., Plaintiff, | ) | |
| v. | ) | 1:25CV603 |
| FRANK BISIGNANO, Commissioner of Social Security, Defendant. | ) | |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Iteasha R. ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSI on April 19, 2021, alleging a disability onset date of August 1, 2017. (Tr. at 4, 146-54.)[1] Her application was denied initially (Tr. at 62-77, 88-92) and upon reconsideration (Tr. at 78-87, 99-102). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 103.) Prior to the hearing, Plaintiff amended her alleged onset date to October 13, 2022. (Tr. at 35,

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

263.) On January 18, 2024, Plaintiff, along with her attorney, attended the subsequent telephone hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 4, 33-61.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 13-14), and, on April 29, 2025, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 20-25.)

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal quotation marks omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability[.]" Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. Id. at 473. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since April 19, 2021, her application date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 6.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> schizoaffective disorder, bipolar type; alcohol use disorder; post-traumatic stress disorder; obesity; Graves' disease; and hyperthyroidism[.]

(Tr. at 6.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 7-8.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work, but with the following, non-exertional limitations:

> [Plaintiff] can frequently stoop, kneel, crouch, and crawl. She should avoid concentrated, meaning can tolerate frequent but not constant, exposure to workplace hazards such as unprotected heights and dangerous machinery. She can understand, remember, and/or carry out simple work of a routine and repetitive nature. [Plaintiff] can maintain attention and concentration for at least two-hour time periods sufficient to adapt to routine, infrequent workplace changes at a non-production pace, meaning no assembly line or conveyor-belt type jobs. [Plaintiff] can tolerate occasional interaction with the public and frequent but not constant interaction with coworkers and supervisors, meaning

> work not requiring teamwork or tandem tasks for completion. She can have frequent but not constant exposure to pulmonary irritants such as dust, fumes, odors and gases and no constant talking or speaking required.

(Tr. at 8.) At step four of the analysis, the ALJ determined that Plaintiff had no past relevant work. (Tr. at 12.) However, the ALJ concluded at step five that, given Plaintiff's age, education, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 12-14.)

Plaintiff now challenges the ALJ mental RFC assessment in two respects. First, Plaintiff argues that the ALJ "failed to account for the absences Plaintiff would incur due to psychiatric hospitalizations." (Pl.'s Br. [Doc. #9] at 1, 5-12.) Second, she contends that the ALJ "failed to account for Plaintiff's experience of hallucinations, paranoia, and aggressive behavior." (Pl.'s Br. at 1, 12-14.) After a thorough review of the record, the Court agrees that both of these contentions require remand.

A. Absences

As Plaintiff correctly notes, her medical records clearly document that, in the roughly 15 months between October 13, 2022, her amended Alleged Onset Date, and January 18, 2024, the date of her hearing, Plaintiff was hospitalized on four occasions due to psychiatric symptoms, totaling 46 days of inpatient treatment. (Pl.'s Br. at 7.) At both step three of the sequential analysis and when assessing Plaintiff's RFC, the ALJ minimized the significance of Plaintiff's hospitalizations. When analyzing Plaintiff's limitations in each of the "paragraph B" areas, namely understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself, the

ALJ found that "healthcare workers generally reported" normal findings, "except for a few periods surrounding her hospitalizations." (Tr. at 7-8) (emphasis added). Crucially, the ALJ never mentions the number of times Plaintiff was hospitalized or the duration and extent of her inpatient treatment. In addition, when explaining the basis for Plaintiff's RFC, the ALJ appears to mischaracterize the reason for Plaintiff's hospitalizations, writing as follows:

> As for [Plaintiff's] medically determinable mental impairments, the record reflects [that Plaintiff] has a history of alcohol use disorder with [Plaintiff] reportedly last drinking alcohol in January 2023, which led to her being hospitalized (Ex. 11F/2; 14F/2). The record reflects [that Plaintiff] had periods of hospitalization wherein she was threatening others, responding to internal stimuli, and exhibiting disordered behavior (Ex. 12F/54; 15F/2). However, upon discharge after each hospitalization, healthcare providers noted that she had an improved or appropriate affect; adequate interaction with peers; linear, logical, and goal-directed thought processes; intact cognition, memory, attention, and fund of knowledge; pleasant and cooperative behavior; and normal language, and she denied suicidal or violent ideations (Ex. 13F/161, 162, 166; 15F/127).

(Tr. at 10.) This summary suggests that at least one, if not all, of Plaintiff's psychiatric hospitalizations resulted from alcohol use. However, the records the ALJ cites to this effect instead indicate that Plaintiff's alcohol use led to an altercation and arrest in January 2023, and that she had not consumed alcohol since that time. (See Tr. at 1005.)[4]

In contrast, all of Plaintiff's psychiatric hospitalizations occurred later in her alleged disability period, beginning with a 21-day involuntary commitment from February 28 through March 20, 2023. (See Tr. at 661-86, 800, 949) As accurately recounted in Plaintiff's brief,

> [U]pon admission, [Plaintiff] admitted that she was experiencing severe auditory hallucinations, hearing voices which terrified her. The voices told her to hurt

[4] The other record cited by the ALJ reflects that, during a prior incarceration, Plaintiff was in a "therapeutic unit" due to her failure to take her medications. (Tr. at 582.) The Court also notes that the Representative's Brief submitted to the ALJ clearly characterized Plaintiff's alcohol use in January 2023 as "a one-time relapse situation" rather than an ongoing impairment. (Tr. at 264.)

> others and to hurt herself. She was afraid to go to sleep because the voices were louder when she tried to sleep. [Plaintiff] also told doctors that she received subliminal messages from her television telling her that they would "get her." [Tr. at] 672. She had gone to the drug store that day and bought various over the counter medications to "lessen the noise in her ears." See [Tr. at 672.] On mental status examination ("MSE"), her thought content was paranoid and delusional, she was oriented to time and place, but appeared distressed and tearful, expressed impulsivity, exhibited depression, and her cognition and memory were impaired. See [Tr. at] 673-74.
>
> Providers signed the commitment papers, and she was assessed with psychosis, unspecified type, hallucinations, auditory hallucinations, and aggression. See [Tr. at] 676. Her IVC paperwork stated the following: She was responding to internal stimuli and talking to herself. She believes that others are out to get her. She has threatened to kill several of her family members. She obsessively boiled multiple pots of water today with no indication as to why. Her mother sleeps with a hammer under her pillow for fear that [Plaintiff] would act on her delusions. See [Tr. at] 948.
>
> While hospitalized, [Plaintiff] expressed symptoms of depression and anxiety, including persistent worrying, fatigue, difficulty concentrating, irritability, restlessness, hopelessness, helplessness, worthlessness, social isolation, poor sleep, diminished appetite, loss of interest in daily routines, and recurrent thoughts of death. See [Tr. at] 667. Over the next 20 days, [Plaintiff] underwent daily therapy sessions. See, e.g., [Tr. at] 614; 645; 654; 852; 862; 872; 905; 913; 915; 918; 933; 942-44; 951. She was prescribed numerous additional medications, and was diagnosed with schizoaffective disorder, bipolar type. See [Tr. at] 947-48. By March 20, 2023, she had experienced improvement in her symptoms, and she was discharged from the hospital. See [Tr. at] 949-50.

(Pl.'s Br. at 8-9.) According to the admission paperwork, the "Reason(s) for Admission" was "disordered/bizarre behavior that interferes with ADLs to such a degree that the individual cannot survive outside the hospital setting." (Tr. at 809.)

In April 2023, during several follow-up appointments at Daymark Recovery Services in the weeks after her release from inpatient treatment, Plaintiff demonstrated fair memory and cognition upon exam, hallucination and paranoia were present, and Plaintiff reported that her paranoia caused sleeping difficulties. (Tr. at 1005, 1010, 1014.) Plaintiff's provider noted that Plaintiff had struggled with psychosis and mood disturbances since age 15, and that she

had been in and out of psychiatric treatment since that time. (Tr. at 1013-14.) Plaintiff's provider prescribed Rexulti for her paranoia. (Tr. at 1010.) On June 1, 2023, Plaintiff reported that her Abilify had been "somewhat helpful" in controlling her auditory hallucinations, but that she was still paranoid, stayed in her room a lot, and slept a lot with "very little reduction in her anxiety" with her increased medications. (Tr. at 1452.)

Just days later, on June 4, 2023, Plaintiff was again hospitalized for mental health symptoms. (Tr. at 1181.) She was taken to the emergency room with altered mental status, tachycardia, and hypotension and was diagnosed as experiencing acute encephalopathy. (Tr. at 1182-84.) Plaintiff's drug screen was negative for illicit substances, and there was instead concern that she was being prescribed too much medication. (Tr. at 1185-89.) Four days later, Plaintiff had stabilized and no longer expressing passive suicidal ideation, and she was discharged on June 7, 2023. (Tr. at 1221-22.)

Unfortunately, Plaintiff's stabilization lasted just a week before she was again hospitalized for 15 days, from June 14 to 29, 2023. (Tr. at 1144, 1155, 1162-63.) She presented to the ER on June 14, 2023, reporting hallucinations, poor concentration, and being off her medications. (Tr. at 1147.) Her screening was negative for alcohol. (Tr. at 1147.) Upon admission, Plaintiff reported "depressive symptoms in the form of thoughts of wanting to die, difficulty sleeping, poor appetite, feelings of hopelessness, crying spells, fatigue, problems focusing, feelings of worthlessness, social isolation, and low motivation." (Tr. at 1147.) She also reported anxiety symptoms including "excessive worrying, nervousness, and daily panic attacks with shortness of breath, racing heart, sweating, nausea, and chest pain." (See Tr. at 1147.) She appeared "internally stimulated" and "acutely decompensated" and was committed

for safety, stabilization, further assessment, and treatment and was discharged on June 29, 2023, once she had achieved stabilization. (Tr. at 1146-54.)

Plaintiff followed up with Community Care Clinic of Rowan County on August 2, 2023, and August 30, 2023, and reported that she was still having paranoid thoughts, was experiencing trouble leaving the house due to paranoia, and was also having trouble sleeping. (See Tr. at 1456-58, 1477-81.) On examination, her thought content was paranoid. (Tr. at 1460, 1483.) Accordingly, her provider increased her Latuda dosage. (Tr. at 1456, 1461.) Nevertheless, Plaintiff was hospitalized for a fourth time a month later, from September 30 to October 5, 2023. (Tr. at 1359-61). On September 30, 2023, Plaintiff was taken to the hospital unresponsive, and after eight hours there, she did not demonstrate any discernible change in her mental status. (Tr. at 1336, 1372.) As at her prior admissions, Plaintiff's screenings were negative for alcohol and drugs (Tr. at 1339-40, 1372), and she was admitted to determine the need for inpatient psychiatric treatment after she could be medically stabilized (Tr. at 1339-40). The records reflect that her condition was ultimately attributed to having taken extra doses of Seroquel in order to sleep. (Tr. at 1339, 1359.) She was discharged several days later, and the examining psychiatrist felt that she would benefit from a home health aide to assist with her medication management. (Tr. at 1340).

At a therapy visit with Daymark on October 20, 2023, Plaintiff explained that she was depressed because she was on so many medications and it was "hard for [her] to focus and to do day to-day things." (Tr. at 1492.) Plaintiff's mother reported that Plaintiff did not eat much and instead spent much of her time in bed; in fact, Plaintiff had been sleeping in her mother's bedroom for the past six to seven months because she was too paranoid to sleep in

her room alone. (Tr. at 1492.) Along these lines, Plaintiff also disliked the open window blinds and watching television. (Tr. at 1492.) Although Plaintiff was not hallucinating or homicidal at that time, she exhibited depression, flat affect, paranoid thought content, and partial insight into her problems upon examination. (Tr. at 1492-93.) She was assessed with schizoaffective disorder, depressive type, "as evidenced by an uninterrupted period of illness in which there [was] a major depressive episode, delusions, anhedonia, sleep disturbance, low energy, lack of motivation, paranoia, and isolation." (Tr. at 1496.)

Plaintiff returned to Daymark a few days later, on October 24, 2023, to see a medical provider, and reported that despite taking her medications, including Effexor and olanzapine, her symptoms were not improving. (Tr. at 1507.) She continued to experience paranoia, intermittent depression, and an inability to sleep well. (Tr. at 1507.) Her mental status examination was grossly normal, and additional medications, such as lamotrigine (Lamictal), were added to her regimen. (Tr. at 1508.) Unfortunately, at a return visit to Daymark on November 20, 2023, Plaintiff reported that she was not doing well. (Tr. at 1511.) She had noted no difference in her mood with starting Lamictal, and she continued to experience heightened anxiety and paranoia, although she denied current hallucinations. (Tr. at 1511.) Plaintiff further reported staying at home and isolating herself from others. (Tr. at 1511.)

Critically, the hospitalizations and other symptomatic flares noted throughout the record were not limited to a small or distinct portion of the time period at issue. As set out above, the relevant time in this case spans fifteen months between Plaintiff's amended onset day, October 13, 2022, and the date of her hearing, January 18, 2024. Plaintiff's hospitalizations occurred throughout this period, with the first spanning from February to

March of 2023, the second and third in June 2023, and the fourth straddling September and October of 2023. Moreover, as the interim treatment notes recounted above make clear, Plaintiff continued to have problems with symptom control outside of these hospitalizations, not only with symptoms, but also with managing her many medications and their side effects.

The ALJ neglected to address the medical records underlying Plaintiff's ongoing mental health struggles in any meaningful way. In fact, the administrative decision includes no discussion of psychiatric treatment records after January 2023. The ALJ's later reliance on the medical opinion evidence to discount the impact of Plaintiff's symptoms does nothing to remedy this problem, as both the psychological consultative examination and the State agency psychological assessment at the initial level, dated October 13, 2022, and November 8, 2022, respectively, took place prior to any of Plaintiff's hospitalizations. (Tr. at 524-28, 73-74.)[5] The only other psychological opinion evidence of record, the State agency psychological assessment upon reconsideration, is dated June 5, 2023. (Tr. at 83-84.) Although this assessment does note Plaintiff's first hospitalization from February to March 2023, the examiner ultimately found there was "insufficient evidence" for a mental RFC evaluation, and specifically that the medical evidence in the record was "not sufficient to properly assess the current severity of [Plaintiff's] mental health impairment and functional limitations." (Tr. at 83-84.) Accordingly, the opinions cited by the ALJ are of little value in assessing Plaintiff's increased symptomology during 2023 as a whole.

[5] Even prior to Plaintiff's multiple hospitalizations, the psychological consultative examiner found that Plaintiff "may at times struggle with efficiently completing routine, repetitive tasks" and "would also likely struggle with relating well to coworkers and superiors," and overall "would struggle with tolerating the stressors related to engaging in day-to-day work activity." (Tr. at 527.)

In terms of potential absences, the ALJ's decision offers no explanation whatsoever, let alone one supported by substantial evidence. As Plaintiff correctly notes, Counsel specifically raised these absences as the basis for finding disability, both in the briefing and at the hearing, and then questioned the vocational expert regarding absences during the hearing. (Tr. at 262-67, 53-54, 59-60.) The expert testified that more than one unexcused absence per month could eliminate all potential jobs at steps four and five of the sequential analysis. (Tr. at 53.) As a follow-up to this testimony, Counsel asked about a hypothetical individual who might be present at work for a full month but would be absent multiple days in other months. In particular, Counsel asked the expert if an individual "missed 27 days of work in unexcused absences in a year's time, [would] it matter how [the absences are] spread out, or would [the absences] be preclusive of all work?" (Tr. at 54.) The vocational expert answered that it didn't matter how the absences were spread out. (Tr. at 54.) Rather, "that level of days would be preclusive of work." (Tr. at 54.)

Defendant, in turn, contends, without explanation, that "the ALJ was not required to include absences in the RFC because Plaintiff failed to prove they were warranted." (Def.'s Br. [Doc. #10] at 6.) He further argues that the present case is distinguishable from Dennis v. Kijakazi, No. 21-2078, 2023 WL 2945903 (4th Cir. Apr. 14, 2023). In Dennis, the Fourth Circuit remanded where the ALJ's failure to discuss evidence supporting the claimant's absenteeism resulted in the court's "inability to provide meaningful review." Id. at *5. In the present case, Defendant argues, "the ALJ considered Plaintiff's hospitalizations." (Def.'s Br. at 6.) However, as discussed at length above, the ALJ not only mischaracterized or ignored the extensive evidence surrounding these hospitalizations, but also relied on evidence

predating the hospitalizations themselves when discounting their significance. The ALJ did not address the absences as a result of the hospitalization at all. Moreover, in discounting the hospitalizations, the ALJ relied only on the conclusion that Plaintiff had improved at discharge, citing to the March 20, 2023, discharge and June 29, 2023, discharge (Tr. at 10), without addressing the fact that after each of those discharges Plaintiff was back in the hospital within three months. These failures clearly render the ALJ's decision unsupported by substantial evidence.

B. Hallucinations, paranoia, and aggressive behavior

Plaintiff's second, related contention provides an additional basis for remand. Specifically, Plaintiff argues that, "[b]eyond the issue of the numerous absences [she] would have incurred due to her hospitalizations for her severe mental health symptomology, the ALJ also erred by failing to account for her recurrent hallucinations, paranoia, and aggressive behavior in the RFC assessment." (Pl.'s Br. at 12.) As noted above, the ALJ found that Plaintiff "had periods of hospitalization wherein she was threatening others, responding to internal stimuli, and exhibiting disordered behavior." (Tr. at 10.) Nevertheless, the ALJ concluded that, "upon discharge after each hospitalization, healthcare providers noted that she had an improved or appropriate affect; adequate interaction with peers; linear, logical, and goal directed thought processes; intact cognition, memory, attention, and fund of knowledge; pleasant and cooperative behavior; and normal language, and she denied suicidal or violent ideations." (Tr. at 10) (citing Tr. at 949, 950, 954, 1152). In other words, the ALJ found that, even though Plaintiff has periods of aggressive and/or disordered behavior, she can still work because she experiences periods of reduced symptoms.

However, as noted above, in discounting the hospitalizations, the ALJ relied only on the conclusion that Plaintiff had improved at discharge, citing to the March 20, 2023, discharge and June 29, 2023, discharge (Tr. at 10), without addressing the fact that after each of those discharges Plaintiff was back in the hospital within three months. The Fourth Circuit has emphasized that ALJs must "appreciate the waxing and waning nature" of some medical conditions and that they must "consider the longitudinal records of [the claimant's] symptoms as a whole." Arakas v. Comm'r of Soc. Sec. Admin., 983 F.3d 83, 101 (4th Cir. 2020); see also Shelley C. v. Comm'r of Soc. Sec. Admin., 61 F.4th 341, 368 (4th Cir. 2023) ("The waxing and waning of [the claimant's] symptoms would hinder her from being a dependable employee."). The Fourth Circuit similarly observed in Testamark v. Berryhill that, "[b]ecause symptoms of mental illness may wax and wane over the course of treatment, the fact that [the claimant] exhibited fair judgment or appeared cooperative on certain specific occasions is not inconsistent with the conclusion that she is unable to work." Testamark, 736 F. App'x 395, 398-99 (4th Cir. Aug. 31, 2018). Overall, Plaintiff argues, the fact that Plaintiff's mental status examinations

> are sometimes abnormal and sometimes normal does not detract from her disability as the longitudinal records demonstrate these issues are ongoing and have not been adequately controlled with treatment. Even when she is not hospitalized for an acute exacerbation, [Plaintiff] continues to express feelings of paranoia, fear of leaving her house (agoraphobia), depression, and anxiety with intermittent auditory hallucinations which would prevent her from maintaining a job over time due to the off task behavior these symptoms would cause. Yet, there is no allowance for off task time in the RFC to account for her experience of paranoia, hallucinations, aggression and other behavior which would be at best distracting and at worst dangerous in a work environment.

(Pl.'s Br. at 13-14) (internal citations omitted). Moreover, the ALJ found that Plaintiff could "frequently" interact with coworkers and supervisors despite her many mental impairments and related symptoms. In making this finding, Plaintiff argues,

> The ALJ ignores that the basic demands of unskilled work include the ability "to respond *appropriately* to supervision, coworkers, and usual work situations" and that an inability to do so justifies a finding of disability. See, e.g., [Social Security Rulings ("SSRs") 85-15 and 96-9p] (emphasis added). This recognizes that an employee does not have to be inappropriate with supervisors and coworkers all day every day in order for them to be fired due to inappropriate behavior. Thus, it is not just the *amount* of interaction that [Plaintiff] would have with others during the workday that would be problematic – it is also the *quality* of that interaction. Even if [Plaintiff was interacting] inappropriately . . . with others for only part of the day due to her psychiatric symptoms (and if severely inappropriate, likely just once) she would still be subject to firing.

(Pl.'s Br. at 14.) In this regard, as noted above, the psychological consultative examiner specifically concluded that Plaintiff "would also likely struggle with relating well to coworkers and supervisors" as a result of her "schizoaffective disorder, bipolar type." (Tr. at 527.)

The Court agrees that the waxing and waning nature of Plaintiff's mental health symptoms, particularly given the extreme and frequent "waxing" periods during which Plaintiff was involuntarily hospitalized, were not adequately considered by the ALJ. As discussed at length in subsection A of this Order, the ALJ repeatedly focused on periodic, "normal" mental findings and evidence predating Plaintiff's 2023 hospitalizations and, in doing so, failed to address Plaintiff's mental health as a whole during the relevant time period. This approach defies both the regulations and judicial review.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability be REVERSED, that Defendant's Dispositive Brief [Doc. #10] be DENIED, that

Plaintiff's Dispositive Brief [Doc. #9] be GRANTED, and that this action be REMANDED for further consideration in accordance with the directives set out herein.

This, the 29th day of September, 2026.

Joi Elizabeth Peake
United States Magistrate Judge